## IN THE OREGON TAX COURT

## SAUNDERS

*v.*

## DEPARTMENT OF REVENUE
### (TC 2477)

Plaintiff appeared *pro se.*

Jerry Bronner, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered March 19, 1987.

**CARL N. BYERS, Judge.**

Plaintiff is a dairy farmer appealing the assessed value of two Harvestore silo units. The assessed value as of January 1, 1985, is $54,440. Plaintiff claims that the two units have no value.

The subject property consists of two free-standing metal silos sold under the brand name of Harvestore. Both silos are 20 feet in diameter; the larger unit is 77 feet tall and the smaller unit is 33 feet tall. Intended to be a modern, state-of-the-art answer to cattle feed storage problems, the silos are constructed of glass-coated steel. They are designed to be air-tight and completely automated. Although utilizing a concrete foundation, they can be disassembled and moved to a new

location. In actual use, the silos have proven to be less than ideal. While the most common problem appears to be unloader breakdown, perhaps the most serious and difficult problem is air leaks. Air leaks can result in crop spoilage and sick cattle. There was some evidence that frequent and thorough maintenance is required to prevent these problems.

■ In general terms, the test is what price would a willing buyer and a willing seller settle on for the subject property as of January 1, 1985? Spoiled haylage, sick cattle and other serious problems associated with the operation of the Harvestores, resulting in numerous lawsuits, cannot be considered by the court unless they occurred on or before that date. Value is created by what the market believes, not by what the facts are. If, as of January 1, 1985, the farmers who comprise the market for silos thought that Harvestores were still a good thing, the value the market would place on the silos must be the value found by the court.

The court has examined the evidence to see what plaintiff and the market knew as of January 1, 1985. As of that date, the evidence established that there was no market for new Harvestore units. In the late 1970's, when plaintiff purchased his units, a number of new units sold, but by 1985 the market had decayed to the point where no new sales had occurred for two to three years. There was conflicting evidence as to whether a market existed for used units. Defendant's appraiser testified that he found three comparable sales which took place in 1985 in the Boise Valley area in Idaho. While the fact that these sales took place after January 1, 1985, indicates that there was a market for used units in Idaho, the court questions whether they show a used market in Oregon. There was no evidence that Boise Valley and Vale are part of the same market for silos. Plaintiff testified that the wide temperature swings in the Vale area make operation of the Harvestores generally unsuccessful while other areas may be successful. Plaintiff's testimony was that there was no market in Oregon for used Harvestore units. By the assessment date in question, five had been repossessed by dealers but none had been resold. (Exhibit 10.) Plaintiff also testified in an earlier case that no used sales had taken place in Oregon. (Exhibit L, at 17-18.)

As of the assessment date in question, plaintiff was

using both of the subject silos. Although he had experienced some problems with the health of his cows, he had not yet identified feed as the source of the problem. Defendant introduced evidence of plaintiff's statements and opinions from a prior Tax Court case wherein plaintiff litigated the issue of whether the subject silos were real or personal property. *Saunders v. Dept. of Rev.,* No. 2158, slip op (January 11, 1985). That evidence established that in January 1985 plaintiff was optimistic about the use of the silos and had experienced only minor problems with them. (Exhibits K, L and M.) In answering questions from the court, plaintiff testified that his opinion as of January 1, 1985, was that his silos were worth 50 percent of their cost new, or a total of $37,500.

The assessed value in question represents 70 percent of plaintiff's original cost, trended up by 1 percent, consistent with the county's sales ratio studies. Defendant's appraiser accepted the 70 percent estimate furnished to him by a dealer, 4-J Harvestore Systems, Inc. (Exhibit R, Appendix, Page A.) This results in an assessed value of $33,990 for the 77-foot silo and $20,450 for the 33-foot silo. These estimates are to be compared with the comparable Idaho sales found on page five of defendant's appraisal which show a price of $20,000 for a 40-foot silo and $23,500 for a 50-foot silo. The court finds that this market data generally supports the dealer's estimates.

Although plaintiff is knowledgeable as to the Harvestore problems and has a strong opinion of value, that opinion is not supported by the specific market evidence required. Plaintiff submitted evidence as to many other farmers who experienced similar problems with Harvestores, and apparently have the same low opinion of them. Evidence of problems and spoilage, however, is not evidence of value.[1] A farmer who has experienced spoilage of his stored feed may well declare that the silo is worthless. However, until a market transaction takes place, either a sale of a new or used unit, or the leasing or salvaging of a unit, there is no evidence of "market value." This is particularly true when the farmer continues to use the unit.

---

[1] Plaintiff, who appeared *pro se,* was somewhat handicapped in the presentation of his case due to his unfamiliarity with the technical aspects of ad valorem taxation and the rules of evidence. As this court has previously noted, presentation of a property tax case requires a minimum "indispensable background" knowledge. *Price v. Dept. of Rev.,* 7 OTR 18, 24 (1977).

■    Plaintiff's appraiser, Mr. James Webber, appeared to
have limited appraisal experience with regard to specialized
property such as silos. He testified that he had talked to four
other appraisers who valued such silos at zero value. No data
or market evidence was offered to support these conclusions.
He also viewed the silos from an economic point of view,
calculating the capital costs, as well as operating costs, per
cow. Based on these calculations, he concluded that the silos
were uneconomic. Again, however, he did not back up this
conclusion with market data. The fact that new silo units sold
as well as used ones is evidence that some farmers thought
they had value and were economic. Mr. Webber's appraisal
was also deficient in that he failed to relate his opinion of
value to the January 1, 1985, date in question.[2]

It appears to the court that after 1985 the bottom
dropped out of the Harvestore market. The spreading knowl-
edge of problems, the many lawsuits and the government
Dairy Herd "Buyout" Program all contributed to a bleak
future for Harvestore owners. It may well be that such units
are now near or at "zero" value. However, that was not the
case as of January 1, 1985, which is the only year before the
court.

Based on the evidence thus adduced by the parties,
the court finds that the preponderance of the evidence sup-
ports the assessed value of $54,440 as of January 1, 1985. Costs
to neither party.

---

[2] Appraisers experienced in ad valorem tax litigation are aware that while they
usually conduct the appraisal after the assessment date in question, by law and profes-
sion, they must exclude consideration of all irrelevant post-assessment date informa-
tion and relate their opinion of value to the date in question.